**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JEANNINE L. SOMBERG, et al.,

    Plaintiffs,

v.                                                                Case No. 13-11810

UTICA COMMUNITY SCHOOLS,

    Defendant.
_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND
DENYING DEFENDANTS MOTION FOR JUDGMENT**

Pending before the court are cross motions for judgment filed by Plaintiffs, Jeannine Somberg and Dylan Somberg, and Defendant Utica Community Schools ("UCS"). (Dkt. ## 22, 23.) Plaintiffs seek compensatory education under the Individuals with Disabilities Education Act ("the IDEA"), 20 U.S.C. § 1400 *et seq.*, and Defendant denies Plaintiffs' entitlement to compensatory education and also seeks attorney's fees. The matter is before the court on the administrative record, and the court concludes that no hearing is necessary. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons, Plaintiffs' motion is granted and Defendant's motion is denied.

**I. BACKGROUND**

**A. The IDEA**

In exchange for federal funding, the Individuals with Disabilities Education Act ("the IDEA"), 20 U.S.C. § 1400 *et seq.*, imposes on schools systems certain requirements with respect to children with disabilities. As its core component, the IDEA requires schools to identify, locate, and evaluate all children with disabilities and provide

them with a "free appropriate public education" ("FAPE"). *Id.* at § 1412(a)(1)(A). Generally, schools ensure that the student is receiving a FAPE by developing and implementing an individualized education program ("IEP"), which must identify a child's present level of academic and functional performance, establish measurable goals, and outline the services, programs, and accommodations needed to achieve those goals. *Id.* at § 1414(d)(1)(A). The school must review the IEP annually and make any necessary adjustments. *Id.* at § 1414(d)(4).

In case a parent disagrees with his child's IEP or its implementation, the school system is required to maintain and make available a forum through which the parent can present a complaint against the school. *Id.* at § 1415(b)(6)-(8). In Michigan, such complaints are adjudicated through the Michigan Department of Education. Mich. Admin. Code R. 340.1724f(2). After a complaint is filed, the matter is assigned to an administrative law judge ("ALJ") for a hearing. *Id.* at 340.1724f(6). A party "aggrieved" by the final decision of the ALJ may file an appeal with a state or federal court. *Id.* at 340.1724f(7).

## B. Factual Background

On September 5, 2012, Jeannine Somberg filed an administrative complaint, alleging that UCS was failing to provide her son Dylan a FAPE. Dylan was, at the time, eighteen years old and autistic. He was a student at Eisenhower High School eligible for special education services.[1] The administrative complaint was amended on October 1,

---

[1] During this litigation, Dylan has regrettably aged without some of the services he properly seeks. While a portion of the delay can be attributed to rather unorganized briefing and, in the court's view, unnecessarily contentious positions adopted by both parties early in this matter, the court must acknowledge also the role it has played in

2012 and, according to the ALJ assigned to the case, presented the following issues: (1) whether Dylan was denied a FAPE for the 2012-2013 school year because of procedural errors in the September 7, 2012 IEP; (2) wether Dylan was denied a FAPE for the 2012-2013 school year because the September 7, 2012 IEP lacked measurable goals; (3) whether Dylan was denied a FAPE because the September 7, 2012 IEP failed to address a transition plan; and (4) whether Dylan was denied a FAPE in the least restrictive environment. (Dkt. # 22-34, Pg. ID 414.)

During that administrative proceeding, a separate but related issue arose. When staff at Eisenhower High School attempted to place Dylan in a "community based inclusion" program during part of his school day,[2] Dyaln and his mother refused because the program was not allowed by Dylan's IEP. While the school determined what to do with Dylan, they placed him first in a clinic and then an empty classroom with no certified teacher for approximately twenty days. (Compl. ¶¶ 7-8.) This seclusion, Plaintiffs allege, caused Dylan anxiety leading to an autistic meltdown on October 2,

---

prolonging the pendency of this matter. The court is hopeful that with the major issues in contention resolved in this opinion, Dylan will soon be provided the services he is due under the IDEA.

[2]According to Karen Kennedy, UCS' Supervisor for Special Services,

"CBI stands for community based instruction, which represents direct instruction provided to students in the areas of functional skills within a community setting. . . . [S]tudents are able to acquire and generalize and practice those skills that give them greater participation in their adulthood when they leave school. And some of those areas would focus on daily living skills, employability training, recreation leisure, personal social skills . . . ."

(Dkt. # 23, Pg. ID 501.)

2012. After the meltdown, UCS suspended Dylan and recommended his expulsion. (Compl. ¶ 10.) According to the complaint, the suspension lasted for nineteen days. (Compl. ¶ 42.i.) These events triggered the need for a "Manifestation Determination Review" ("MDR"), where Plaintiffs and UCS disagreed as to whether the meltdown was a manifestation of his disability. Concluding the review, UCS ruled that the meltdown was not a manifestation of Dylan's disability. (Compl. ¶ 16.)

As a result of that ruling by UCS, Plaintiffs filed a second administrative complaint. At this point, Dylan and his mother Jeannine were proceeding in two administrative actions: one concerning the alleged FAPE violations, and one seeking review of UCS' MDR determination. According to Plaintiffs, the ALJ ruled in favor of Dylan on the MDR issue. Thereafter Plaintiffs sought, in another federal action before this court, fees associated with the MDR complaint. That case has since been resolved by an offer and acceptance of judgment. *See Somberg v. Utica Cmty. Schools*, No. 13-10330 (E.D. Mich. Aug. 15, 2013).

After several prehearing conferences and preliminary motions, the ALJ held a hearing regarding the FAPE violations on December 4, 2012. On January 29, 2013, the ALJ issued a decision and order, finding that Dylan was not provided a FAPE during the 2012-2013 school year because UCS failed to establish measurable goals for Dylan and, as a separate FAPE violation, failed to establish programming to help Dylan transition into life after high school. (*Id.* at Pg. ID 423-24.) Additionally, the ALJ noted that UCS was out of compliance with the IEP and not providing a FAPE during the time it tried to impose CBI and isolated Dylan without teacher supervision. (*Id.* at Pg. ID 426.)

The instant action arises out of that decision. Plaintiffs' Complaint seeks attorney's fees[3] and review of a number of the ALJ's findings, including the determination that Dylan was not entitled to compensatory education. (Dkt. # 1.) Defendant, in turn, has filed a Counter-complaint, alleging that Plaintiffs have pursued this litigation for an improper purpose and that UCS is therefore entitled to attorney's fees. (Dkt. # 4.)

## II. STANDARD

In an IDEA action, the district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). In doing so, the court engages in a "modified de novo" review of the administrative proceedings. *Deal v. Hamilton Cty Bd. of Educ.*, 392 F.3d 840, 849-50 (6th Cir. 2004). That is, the court is "to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Id.*

"Although reviewing courts must not simply adopt the state administrative findings without an independent re-examination of the evidence, neither may they substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 849 (internal quotation marks and citations omitted). The court must "accord due deference to the state administrative hearing officer's decision." *Id.* at 850. The amount of deference due to administrative findings

---

[3]Plaintiffs have not requested that the court decide whether they are entitled to attorney's fees in the pending motion for judgment.

varies depending on whether such findings are based on educational expertise. *McLaughlin v. Holt. Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant . . . . More weight is due to an agency's determinations on matters for which educational expertise is relevant." *Id.*

### III. DISCUSSION

Plaintiffs' appeal seeks review of a number of aspects of the ALJ's decision. Defendant makes a claim for attorney's fees based on its argument that Plaintiffs have pursued this litigation for an improper purpose. The court will first review the administrative record, focusing primarily on the various issues Plaintiffs raise in their motion for judgment. The court will then address Defendant's allegation that Plaintiffs' complaint was presented for an improper purpose, and that UCS is therefore entitled to attorney's fees under the IDEA.

### A. The "Predetermination" Claim

Plaintiffs first appeal and argue that the ALJ "ruled improperly that Plaintiff was not a prevailing party as to the issue of a Pre-Determined IEP a [sic] procedural and substantive violation of FAPE." (Compl. ¶ 60.) This claim appears to be largely based on events occurring during the period of time that UCS was trying to place Dylan into a CBI program. Plaintiffs ask the court to "reverse the decision of the ALJ and Order there was a serious procedural and substantive violation of FAPE finding Plaintiff as prevailing party, award Plaintiff reasonable attorney's fees, and award the Student compensatory education."

In their motion for judgment, Plaintiffs make much of the argument that Jeannine Somberg was deprived of her right to meaningful participation in the IEP process under the "predetermination" analysis established in *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004). In *Deal*, parents of an autistic student asked to have their child educated under a program that involved one-on-one applied behavioral analysis ("ABA"), but the school rejected that request when it was made in an IEP meeting. The ALJ in that case found that the school had a unofficial policy of refusing to consider ABA services and "pre-selected" the school's standard system without regard to the student's individual needs. *Id.* at 855. Considering the administrative record, the Sixth Circuit found that

> [t]he evidence reveals that the School System, and its representatives, had pre-decided not to offer Zachary intensive ABA services regardless of any evidence concerning Zachary's individual needs and the effectiveness of his private program. This predetermination amounted to a procedural violation of the IDEA. Because it effectively deprived Zachary's parents of meaningful participation in the IEP process, the predetermination caused substantive harm and therefore deprived Zachary of a FAPE.

*Id.* at 857. Schools cannot independently develop a proposed IEP that places a student in a preexisting, predetermined program without considering any alternatives with other members—including parents—of the IEP team. *Id.* at 857-58.

This analysis, however, is a poor fit for the situation at hand. It is established that Dylan's IEP did not allow for CBI. The school conceded this fact before the administrative hearing. As the ALJ found in her decision, UCS was not in compliance with the IEP during the time it was trying to force CBI onto Dylan, nor was UCS in compliance when the school placed him in a clinic or alone in a classroom when the attempts at imposing CBI failed. (Dkt. #22-34, Pg. ID 426.) Plaintiffs complaint as to the

7

CBI issue is that the IEP was not followed, not that it should have been written differently.

Indeed, the ALJ *did* note that UCS admitted to being out of compliance with the IEP. She then properly found that during this time Dylan was denied an appropriate education. (Dkt. # 22-34, Pg. ID 426.) The problem was not one of predetermination under *Deal*, but of general non-compliance with elements of an otherwise unobjected to IEP. This is obvious because Jeannine Somberg was fighting to enforce the IEP as to the ban on CBI, not change the IEP. Therefore, to some extent, Plaintiffs already have what they are asking for—a determination that some FAPE violation arose from the CBI dispute.

**B. Compensatory Education**

Plaintiffs argue that because "UCS has been adjudicated as having twice violated FAPE, the Plaintiff should have been awarded compensatory education in order to place him in the position he would have occupied but for the UCS violations of a FAPE." (Compl. ¶ 67.) An award of compensatory education is an equitable remedy granted by the court as it finds appropriate. *Fayette Cty.*, 478 F.3d at 316. An appropriate award of compensatory education is "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Id.* at 316 (quoting *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994)). In general, compensatory awards "should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *Id.* (quoting *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).

The ALJ outlined a number of violations that, in her estimation, each constituted denials of a FAPE. First, she found that Dylan was denied a FAPE for the 2012-2013 school year due to a lack of measurable goals in the September 7, 2012 IEP. She found that "the goals listed in the IEP are not measurable with the exception of Speech and Language goals." (Dkt. #22-34, Pg. ID 423.) The other subjects contained vague standards for success that where not judged from any baseline or expected performance. Moreover, the ALJ noted that the school social worker, the individual responsible for tracking the social and emotional goals category, testified that she was not keeping any monthly records aimed at measuring Dylan's success. *Id.* Relatedly, the IEP mandated that Dylan would be given a trial period with assistive technology that was to be documented and measured for success, but that never occurred. (*Id.* at Pg. ID 423-24.)

Defendant challenges this finding of a FAPE violation by arguing that the failure to establish measurable goals is merely a procedural violation, and that the ALJ failed to find that there was any resulting substantive harm as required by *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004). Even accepting that the ALJ did not make this specific finding, it is not difficult to see how failing to establish measurable goals can and did cause substantive harm. With no ability to track progress, UCS could not tell whether its methods were working or if a particular goal had been achieved, thus impeding any progress. The lack of measurable and achievable goals and the failure to track his progress might, for example, explain why Dylan appears to have taken the same earth science course three years in a row. (*See* Dkt. # 22-10, Pg. ID 335.) The lack of accountability and failure to measure goals might also explain why Dylan's IEP

9

called for a trial with assistive technology that never occurred. This court finds that the lack of measurable goals caused substantive harm.

Second, the ALJ found a FAPE violation because the transition plan in Dylan's IEP was "woefully inadequate." (*Id.* at Pg. ID 424.) Federal law requires that, for students sixteen years and older, an IEP include "[a]ppropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills" and "[t]he transition services (including courses of study) needed to assist the child in reaching those goals." A review of the record and the relevant IEP shows that the ALJ was correct. The ALJ wrote:

> Although [the IEP] lists various assessments as completed, the assessments are not included in the IEP nor are any results from the assessments. There does not appear to be any connection between goals and services. It appears that the transition considerations in the IEP were nothing more than a check box or fill in the blank with no thought or consideration given. For instance, as an adult living goal, Student identified that he "would like to get married and have his own home". [sic] Next, box [sic] provides for his current living arrangement as "Student lives with his mother." For the check box, the question is there a need for activities or services for adult living and the "no" box is checked. If the goal is to have his own home and he currently lives with a parent, it is clear that there needs [sic] to be steps or services identified in order for Student to accomplish this goal. This transition plan provides nothing.

(*Id.*) Indeed, the IEP noted the need for a follow-up meeting for further transition planning, but the record reflects that no such meeting occurred.

Defendant seems to challenge this finding of the ALJ by arguing that CBI *would have been* appropriate transition training for Dylan. (Def.'s Mot. 21.) This argument misses the point. UCS cites testimony from Ms. Rogala, the transition services coordinator, and Ms. Kennedy, the supervisor for special services, who testified at the

hearing about the various elements of a well-developed transition plan and opined that CBI would have addressed those elements. (*Id.* at 19-21.) However, CBI was not, as UCS admits, part of Dylan's IEP. As CBI was not included, the school had an obligation to include other transition services, and it failed to do so.

Lastly, presumably referencing the period of time UCS tried to impose CBI and instead shuffled Dylan into a clinic or a secluded room, the ALJ noted that UCS "admitted that at the beginning of the school year in September 2012, the Student's schedule was not in compliance with the IEP" and that therefore "the Student was denied an appropriate education." (Dkt. #22-34, Pg. ID 426.) This would be yet another violation depriving Dylan of a FAPE for at least the approximately twenty days he was denied the educational benefits mandated by his IEP. Confusingly, the the ALJ followed this recognition by stating: "However, this has been resolved. There is no further need for remedy regarding this issue." *Id.* The ALJ provided no support or analysis that could help this court understand why Dylan would not be entitled to some compensatory education for this and the other FAPE violations. If the goal is to fashion a remedy that places the student in the position he would have been had there been no FAPE vioaltion, *see Fayette Cty.,* 478 F.3d at 317, then mere cessation of a violation will generally not be enough to reverse the harm already done.

The relief the ALJ afforded for the other two previously discussed violations is subject to the same criticism. The remedies ordered were forward looking only. The ALJ ordered UCS to reconvene the IEP team to establish adequate transition services, develop measurable academic and functional goals, and implement an assistive technology assessment. These remedies are designed to curtail further damage, but

they fail to address the need to compensate Dylan for education he was not provided in the past. The ALJ held, without elaboration, that Dylan was not entitled to compensatory relief, but it is unclear how Dylan could ever hope to be made whole without some compensatory education.

While this court owes some deference to the determinations of the ALJ, "the amount of deference due to administrative findings varies depending on whether such findings are based on educational expertise." *McLaughlin v. Holt. Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). The ALJ's decision to completely deny Dylan compensatory education relief cannot be determined to be "based on educational expertise" because of the lack of any explanation or justification. The decision therefore is due considerably less deference.

Other courts have recognized that prospective correction of a deficient IEP is not generally enough to remedy a past FAPE violation. The D.C. Circuit succinctly explained that because federal law "requires only that schools provide 'some education benefit'—a standard that looks to the child's present abilities—an IEP conforming to that standard carries no guarantee of undoing damage done by prior violations." *Reid*, 401 F.3d at 523 (citing *Bd. of Educ. of Hendrick Hudson Central Sch. Dist.., Weschester Cty. v. Rowley*, 458 U.S. 176 (1982)). This common sense proposition applies here. If Dylan missed out on significant and valuable instruction like transition programming, for example, then starting such programming late in the game leaves Dylan at a disadvantage. Accordingly, the court finds that Dylan is entitled to some measure of compensatory education.

The questions of how to award compensatory education, and in what measure, are exercises in fact-finding and remedy-crafting that entail "broad discretion" and implicate "equitable considerations." *Reid*, 401 F.3d at 522 (quoting *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993)). Courts have struggled to fashion appropriate standards for awarding compensatory education. Some have favored an hour-for-hour loss calculation, providing one hour of compensatory education for every hour missed due to the deficient education program. *See e.g.*, *M.C. on Behalf of J.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 391-91 (3d. 1996). Other courts have criticized this approach, noting that the rigidity of the hour-for-hour approach is incongruous with the IDEA's aim to provide specialized services to meet the unique needs of each student; some students may easily recover, while others may need services that exceed the hour-for-hour replacement of time spent without a FAPE. *Id.* This court is satisfied that the Sixth Circuit affords district courts broad discretion and, at bottom, requires only "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Fayette Cty.*, 478 F.3d at 316.

Given the potentially fact intensive nature of this inquiry, further proceedings and perhaps expert testimony will be required to determine the proper quality and quantity of compensatory education that must be awarded. Accordingly, the court will hold a status conference with the parties to establish a scheduling order for these proceedings.

### D. Attorney's Fees

The court finds Defendant's claim for attorney's fees to be without merit. The IDEA provides that attorney's fees are available to a prevailing state educational agency like UCS if the complaint or subsequent cause of action was presented for any improper

purpose. *Id.* at § 1415(i)(3)(B)(i)(III). A finding of an "improper purpose" requires both that the claim is frivolous and results from an improper motive. *See First Bank of Marietta Underwriters Ins. Co.*, 307 F.3d 501, 524 (6th Cir. 2002); *R.P. ex rel C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1126 (9th Cir. 2011). Thus a claim that is not frivolous cannot be brought for an improper purpose.

Defendant argues that Plaintiffs frivolously asserted the claim that a procedural FAPE violation occurred because an IEP meeting, which resulted in changes to the IEP, was held in September 2012 without parental knowledge. The ALJ found, and after a review of the administrative record this court agrees, that there was no September 2012 IEP meeting that might have provided the basis for a procedural FAPE violation. (Dkt. # 22-34.) This, however, does not mean that such a claim was frivolous. The record shows that there was much confusion, in part because of administrative mistakes made by UCS, about when and where changes to Dylan's IEP were being made. As the ALJ noted, "it is clear that the Respondent School District inadvertently printed out the wrong IEP . . . as a result of the school staff rushing in an attempt to accommodate Petitioner's request for a print out of the IEP." (*Id.*) While in fact no meeting or unauthorized amendments to the IEP occurred, it appears that Plaintiffs had some reason to believe, and there was some merit to the argument, that changes were being made without parental involvement. Defendant has not proven by a preponderance of the evidence that Plaintiffs' claim was brought for an improper purpose.

## V. CONCLUSION

IT IS ORDERED that Plaintiffs' Motion for Judgment (Dkt. # 22) is GRANTED as follows:

(1) UCS shall pay for compensatory education for Plaintiff Dylan Somberg in a manner and amount to be determined by further proceedings before this court.

(2) Counsel shall appear before the court on **April 27, 2016 at 2:00 p.m.** for an in-person conference to establish a schedule for such further proceedings.

IT IS FURTHER ORDERED that Defendant's Motion for Judgment (Dkt. # 23) is DENIED.

      s/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated: March 30, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 30, 2016, by electronic and/or ordinary mail.

      s/Lisa Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522